# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made and entered into as of July 1, 2009, by and between Opus West Corporation, a Minnesota corporation ("<u>Seller</u>"), and Arbeit Investment Limited Partnership, a Delaware limited partnership ("<u>Purchaser</u>").

## W I T N E S S E T H :

WHEREAS, Seller intends to become a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. Section 101 et seq. (the "<u>Bankruptcy Code</u>") pursuant to a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") to be filed in the near future in the United States Bankruptcy Court for the Northern District of Texas (the "<u>Bankruptcy Court</u>"); and

WHEREAS, Seller presently owns fifty percent (50%) of the membership interests in Arbowest (the "<u>Property</u>"); and

WHEREAS, Arbowest presently owns as its sole asset fifty percent (50%) of the membership interests in Opus Collier, L.L.C., a Delaware limited liability company (the "<u>OC Joint Venture</u>"); and

WHEREAS, certain terms used in this Agreement are defined in <u>Article 1</u> below; and

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code all of the Property and Assumed Liabilities, all as more specifically provided herein.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements hereinafter contained, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Agreement</u>" shall have the meaning set forth in the Recitals of this Agreement.

"<u>Arbowest</u>" means Arbowest, L.L.C., a Delaware limited liability company.

"<u>Assumed Liabilities</u>" shall have the meaning set forth in <u>Section 2.2</u> of this Agreement.

"<u>Bankruptcy Case</u>" shall have the meaning set forth in the Recitals of this Agreement.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals of this Agreement.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the Recitals of this Agreement.



EXHIBIT
"A"

"Bidding Procedures Order" means an order of the Bankruptcy Court prescribing the manner in which bids will be solicited and received with respect to the sale of the Property.

"Business Day" means any day of the year on which national banking institutions in Arizona are open to the public for conducting business and are not required or authorized to close.

"Closing" shall have the meaning set forth in Section 4.1 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 4.1 of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" shall have the meaning set forth in Section 7.1 of this Agreement.

"Confidential Information" shall have the meaning set forth in Section 8.6 of this Agreement.

"Cure Amounts" shall have the meaning set forth in Section 2.4(a) of this Agreement.

"Excluded Liabilities" shall have the meaning set forth in Section 2.3 of this Agreement.

"Final Order" means an order or judgment, the operation or effect of which has not been stayed, reversed or amended and as to which order or judgment the time to appeal has expired and as to which no appeal was filed, or if filed, is no longer pending and has been fully and finally resolved.

"Governmental Authority" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, alternative dispute resolution, proceedings (public or private) or claims or any proceedings by or before a Governmental Authority or the Bankruptcy Case.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all fines, penalties, costs and expenses relating thereto, resulting from or incurred in connection with the ownership of the Property.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, adverse claim, and transfer restriction under any agreement, of any kind or nature, known or unknown.

DAL 77,446,490.1

"OC Property" means that certain real property owned by OC Joint Venture and located in the city of Phoenix, Arizona, consisting of an undeveloped parcel and an adjacent retail development containing approximately Thirty Thousand (30,000) square feet of developed space, together with all appurtenant rights.

"Order" means any order, injunction, judgment, decree, ruling, consent, approval, writ, assessment or arbitration award of a Governmental Authority.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, association, estate, Governmental Authority or other entity.

"Property" shall have the meaning set forth in the Recitals of this Agreement.

"Purchase Price" shall have the meaning set forth in Section 3.1 of this Agreement.

"Purchaser" shall have the meaning set forth in the Recitals of this Agreement.

"Purchaser Documents" shall have the meaning set forth in Section 6.2 of this Agreement.

"Representatives" means with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, advisors, and other representatives.

"Sale Motion" means the motion or motions of Seller, in form and substance reasonably acceptable to Purchaser and Seller, seeking approval and entry of the Bidding Procedures Order and the Sale Order.

"Sale Order" means an order of the Bankruptcy Court approving the terms and conditions of the sale of the Property.

"Seller" shall have the meaning set forth in the Section of the Recitals hereof.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property, excise taxes under Section 4358 of the Code, unrelated business income taxes, and estimated taxes, whether disputed or not, and (ii) all interest, penalties, tines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

1.2     Other Definitional and Interpretive Matters.

(a)     Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

-3-

(i)      Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(ii)      Headings. The division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(iii)      Herein. The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(iv)      Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)      The parties hereto have been advised by experienced counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF PROPERTY; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Property. On the terms and subject to the conditions set forth in this Agreement, at the Closing and subject to Bankruptcy Court approval as provided under Section 363(f) of the Bankruptcy Code, Purchaser shall purchase, acquire and accept from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser all of Seller's right, title and interest in, to and under the Property, free and clear of any and all existing Liens.

2.2    Assumption of Liabilities. On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing Date, and shall timely pay, perform and discharge in accordance with their respective terms, the following Liabilities (collectively, the "Assumed Liabilities"):

(a)      all Liabilities, including continuing performance obligations, accruing from and after the Closing with respect to the Property; and

(b)      the Transfer Taxes applicable to the transfer of the Property pursuant to this Agreement, if any.

2.3    Excluded Liabilities. Except for the Assumed Liabilities, Purchaser shall not assume or become liable for the payment or performance of any Liability of Seller or otherwise related to the Property of any nature whatsoever, known or unknown, fixed or contingent,

accrued or incurred prior to the Closing Date ("Excluded Liabilities"), which shall remain Liabilities of Seller.

2.4     Cure Amounts.

(a)     Except as otherwise permitted by the next sentence of this paragraph, and pursuant to Section 365 of the Bankruptcy Code, at Closing Seller shall assign to Purchaser, and Purchaser shall assume from Seller, the Property. The cure amounts, if any, as determined by the Bankruptcy Court, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses, if any, that have resulted from any defaults on the part of Seller in respect of the Property shall be paid by Purchaser (or Purchaser shall have delivered into escrow on terms reasonably acceptable to Seller and Purchaser amounts sufficient to pay any claim therefore that remains disputed as of the Closing Date, as such amount shall have been determined by the Bankruptcy Court) at or before the Closing Date, (except as otherwise agreed to by the other party to the Property) and Seller shall have no liability for any such cure amount. The cure amounts to be paid by Purchaser in accordance with the foregoing provisions of this Section 2.5 are hereinafter sometimes referred to as the "Cure Amounts."

(b)     Without limiting the Seller's obligations under Section 8.3, Purchaser shall not have the right to terminate this Agreement as a result of the failure by Seller or inability of Seller to assign the Property to Purchaser at Closing on terms and conditions no less favorable than those in existence as of the date hereof.

2.5     Further Conveyances and Assumptions.

(a)     From time to time following the Closing, each party shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and Seller Documents and to assure fully to Seller and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement and Seller Documents, and to otherwise make effective the transaction contemplated hereby and thereby.

(b)     To the extent that the assignment of the Property shall require the consent of any other party and such consent shall still be required notwithstanding the Sale Order and Sections 363 and 365 of the Bankruptcy Code, nothing in this Agreement shall be construed as an attempt or agreement to assign the Property unless and until such consent shall have been obtained.

## ARTICLE III
## CONSIDERATION

3.1     Purchase Price. The consideration for the Property shall be comprised of the following: (a) One Million Seven Hundred Thousand Dollars ($1,700,000.00); (b) the aggregate Cure Amounts, if any, payable by Purchaser under Section 2.4; and (c) Transfer Taxes, if any (the "Purchase Price").

-5-

3.2 Payment of Consideration. On the Closing Date, Purchaser shall pay to Seller by wire transfer of immediately available funds into an account designated by Seller, an amount equal to the Purchase Price as set forth in Section 3.1. In addition, Purchaser shall assume the obligation to pay in the ordinary course of business after the Closing Date, the Assumed Liabilities and any other amounts set forth in Section 3.1.

3.3 Credit for Outstanding Loan Balance. Purchaser has agreed to provide a loan to Seller in a principal amount not to exceed One Million Five Hundred Thousand Dollars ($1,500,000.00) pursuant to the provisions of a Promissory Note of even date with this Agreement. Purchaser shall be entitled to receive a credit of all or any portion of the outstanding principal of the loan plus unpaid interest accrued thereon toward the payment of the Purchase Price on the Closing Date and the amount of immediately available funds required to be provided pursuant to Section 3.2 shall be reduced by the amount of such credit.

## ARTICLE IV
## CLOSING AND TERMINATION

4.1 Closing Date. Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 (or the waiver thereof by the party entitled to waive that condition), the closing of the purchase and sale of the Property and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at such place as Seller and Purchaser may designate in writing on a date that is no less than two (2) Business Days following the satisfaction or waiver of the conditions set forth in Article X (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), but in no event later than September 30, 2009, unless another time or date, or both, are agreed to in writing by Seller and Purchaser. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by Seller and Purchaser in writing, regardless of the time at which the Closing is completed, the Closing shall be deemed effective and all right, title and interest of Seller in the Property, and any Assumed Liability and all risk of loss with respect to the Property, shall be considered to have passed to Purchaser as of 12:01 p.m. on the Closing Date.

4.2 Deliveries by Seller. At the Closing, Seller shall deliver to Purchaser:

(a) a true and complete copy of the certificate of formation of Arbowest, and all amendments thereto, certified by the State of Delaware;

(b) a true and complete copy of the operating agreement of Arbowest, and all amendments thereto, certified by Seller;

(c) true and complete copies of resolutions of the board of directors of Seller, certified by Seller, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transaction contemplated hereby by Seller;

(d) a duly executed quit claim conveyance deed as to the Property in a form reasonably acceptable to Purchaser and Seller;

-6-

(e)     a duly executed bill of sale and assignment and assumption agreement, as to the Property, in a form reasonable acceptable to Purchaser and Seller;

(f)     the certificates required to be delivered pursuant to Sections 10.1(a) and 10.1(b);

(g)     a certified copy of a resolution adopted by the Board of Arbowest approving the sale of the Property pursuant to and in accordance with Section 14.1 of the Limited Liability Company Agreement of Arbowest;

(h)     such other documents, instruments and certificates as Purchaser may reasonably request; and

(i)     a certified copy of the Sale Order having been entered by the Bankruptcy Court and docketed, in form and substance reasonably acceptable to Purchaser.

4.3     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to Seller:

(a)     the Purchase Price as set forth in Section 3.1  hereof;

(b)     a duly executed assignment and assumption agreement in a form reasonably acceptable to Purchaser and Seller;

(c)     the certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b);

(d)     true and complete copies of resolutions and/or consents of the board of directors/managers/members of Purchaser, certified by Purchaser, authorizing the execution, delivery and performance of this Agreement and all instruments and documents to be delivered in connection herewith, and the transaction contemplated hereby by Purchaser; and

(e)     such other documents, instruments and certificates as Seller may reasonably request.

4.4     Termination of Agreement.  In respect of the transaction contemplated by this Agreement, this Agreement may be terminated prior to the Closing as follows:

(a)     Termination by Purchaser.  Purchaser may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Purchaser to close that are set forth in Sections 10.1 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Purchaser of any covenant or agreement contained in this Agreement, and such condition is not waived by Purchaser; or

(ii)     if there shall be a material breach by Seller that is materially adverse to Purchaser of any material representation or warranty, or any covenant or agreement

-7-

DAL 77,446,490.1

contained in this Agreement which breach cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Purchaser to Seller of such breach; or

(iii)     so long as Purchaser is not then in breach of its obligations under this Agreement in any material respect, if (A) the Bidding Procedures Order is not entered within sixty (60) days from the date hereof or (B) the Sale Order is not entered within ninety (90) days from the date hereof.

(b)     Termination by Seller.  Seller may terminate this Agreement upon the occurrence of any of the following:

(i)     if any of the conditions to the obligations of Seller to close that are set forth in Sections 10.2 and 10.3 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(ii)     if there shall be a material breach by Purchaser that is materially adverse to Seller of any material representation or warranty, or by Purchaser of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within twenty (20) Business Days after the giving of written notice by Seller to Purchaser of such breach.

(c)     Termination by Purchaser or Seller.  Either Purchaser or Seller may terminate this Agreement upon the occurrence of any of the following:

(i)     by mutual written consent of Seller and Purchaser;

(ii)     if the Bankruptcy Court shall enter an order approving a Competing Bid, and a transaction associated with such bid that actually closes, subject to any limitations set forth in the Bidding Procedures Order;

(iii)     upon written notice to the other party if the Closing shall not have occurred by the close of business on September 30, 2009; provided, however, that if (A) the Closing shall not have occurred by the close of such date due to an action or failure to act by a Governmental Authority that prevents the consummation of the transaction contemplated by this Agreement and (B) the non-terminating party is otherwise capable of satisfying the conditions to its obligations to consummate the transaction contemplated by this Agreement set forth in Article X, a termination under this Section 4.4(c)(iii) shall not be effective for forty-five (45) days after the provision of written notice; provided, further, that such termination shall not be effective if all conditions to the obligations of the non-terminating party to consummate the transaction contemplated by this Agreement set forth in Article X shall have been satisfied or otherwise waived and the Closing shall have occurred within such 45-day period.

(d)     Extension of Time Periods.  The time periods for termination of this Agreement set forth in this Section 4.4 may be extended upon the written agreement of the parties without the further consent of the Bankruptcy Court.

DAL 77,446,490.1

4.5    Procedure For Termination.  In the event of termination of this Agreement by Purchaser or Seller, or both, pursuant to Section 4.4, written notice thereof shall forthwith be given to the other party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 4.4), the transaction contemplated by this Agreement shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 4.6 without further action by the parties.

4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to any party; provided, however, that the obligations of the parties set forth in Sections 4.6 and 8.6 and Article XII of this Agreement, and to the extent necessary to effectuate the foregoing enumerated provisions, Article I of this Agreement shall survive any such termination and shall be enforceable in accordance with their terms.  In addition, if this Agreement is terminated as provided herein, each party shall upon request redeliver or destroy as soon as practicable any or all documents, work papers and other material of any other party relating to its business or affairs or the transaction contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same, other than any material which is of public record.

(b)    Nothing in this Section 4.6 shall relieve the parties of any liability for a breach of this Agreement prior to the date of termination.  Notwithstanding the foregoing, no attorneys' fees reasonably incurred by a party in connection with the transaction contemplated hereby shall be payable to or out-of-pocket expense reimbursement or other fees shall be made to any party upon termination of this Agreement pursuant to Section 4.4.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that:

5.1    Organization and Good Standing.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Minnesota and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

5.2    Authorization of Agreement.  Except for such authorization as is required by the Bankruptcy Court (as hereinafter provided for), Seller has all requisite power, authority and legal capacity to execute and deliver, and has taken all corporate action, including approval of its directors, members and/or trustees (as applicable), necessary for it to validly execute and deliver, this Agreement and each other agreement, document, or instrument or certificate contemplated by this Agreement to be executed and delivered by Seller in connection with Seller entering into this Agreement.

5.3    Consents of Third Parties: Contractual Consents.  To the knowledge of Seller, as of the date hereof, the Property can be assigned to the applicable Purchaser pursuant to Section

365(c)(1) of the Bankruptcy Code without the consent of the counterparty or relevant Governmental Authority, as applicable.

5.4    Title to Property.    Seller owns the Property and Purchaser will be vested with good title to the Property, free and clear of all Liens.

5.5    Litigation.    Except for Legal Proceedings that have been stayed, there are no Legal Proceedings pending or, to the knowledge of Seller, threatened with respect to or involving the Property before any Governmental Authority.

5.6    OC Joint Venture Matters.    The representations and warranties contained in this Section 5.6 are the sole and exclusive representations and warranties of Seller pertaining or relating to the ownership by Arbowest in OC Joint Venture.

(a)    OC Joint Venture is a Delaware limited liability company authorized and admitted to do business in the state of Arizona.

(b)    Arbowest is the owner of fifty percent (50%) of the membership interests of OC Joint Venture and owns such membership interest free and clear of all Liens.

(c)    To the knowledge of Seller, there are no Legal Proceedings pending or to the knowledge of Seller threatened with respect to or involving OC Joint Venture or Arbowest's membership interest in OC Joint Venture.

(d)    Notice has been given by Seller pursuant to and in accordance with Section 12.6 of the Operating Agreement of OC Joint Venture regarding the sale of the Property.

5.7    OC Property Matters.    The representations and warranties contained in this Section 5.7 are the sole and exclusive representations and warranties of Seller pertaining or relating to the OC Property.

(a)    OC Joint Venture is the fee title owner of the OC Property. Title to the OC Property is good and marketable.

(b)    To the knowledge of Seller, the ownership and operation of the OC Property are in compliance in all material respects with all applicable zoning and building codes, environmental laws and all other applicable governmental codes and regulations.

(c)    To the knowledge of Seller, Seller is not the subject of any outstanding Order, notice, directive, or other writing from any Governmental Authority respecting (i) environmental laws, (ii) remedial action, (iii) any release or threatened release, in each case, relating to the operation of the OC Property, or (iv) violation of any other governmental code or regulation.

(d)    To the knowledge of Seller, neither Seller, Arbowest, nor OC Joint Venture has received any written communication or other notice alleging that Seller, Arbowest or OC Joint Venture may be in violation of any environmental law or may have any liability under any environmental law, in each case related to the OC Property.

-10-

(e)     To the knowledge of Seller, there are no Legal Proceedings pending or to the knowledge of Seller threatened with respect to or involving the ownership or operation of the OC Property.

5.8     <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Seller in connection with the transaction contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from Purchaser in respect thereof.

5.9     <u>No Other Representations or Warranties</u>. Except for the representations and warranties contained in this <u>Article V</u>, neither Seller nor any other Person makes any other express or implied representation or warranty with respect to the Seller, the Property, the Assumed Liabilities, the transaction contemplated by this Agreement, Arbowest, OC Joint Venture, or the OC Property and Seller disclaims any other representations or warranties, whether made by the Seller, its affiliates or any of their respective officers, directors, employees, agents or other Representatives. Except for the representations and warranties contained in this <u>Article V</u>, Seller (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, and (ii) disclaims all liability and responsibility for any representation, warranty, projection forecast, statement, or information made, communicated, or furnished (orally or in writing) to Purchaser or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Purchaser or its Representatives by any director, officer, employee, agent, consultant, or other Representative of the Seller or any of their Affiliates). Seller makes no representations or warranties to Purchaser regarding the probable success or profitability of the Property, Arbowest, OC Joint Venture or the OC Property. The disclosure of any matter or item in this Agreement shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

6.2     <u>Authorization of Agreement</u>. Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by it in connection with the consummation of the transaction contemplated hereby and thereby (the "<u>Purchaser Documents</u>") and to consummate the transaction contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and Purchaser Documents have been duly authorized by all necessary governance on behalf of Purchaser.  This Agreement has been, and Purchaser Documents will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto

-11-

and thereto) this Agreement constitutes, and Purchaser Documents when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

6.3     Conflicts; Consents of Third Parties.

(a)     Purchaser is not required to obtain any consent, approval, authorization, waiver, Order, license or Permit of or from, or to make any declaration or filing with, or to give any notification to, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement or the Purchaser Documents by Purchaser, the compliance by Purchaser with any of the provisions hereof or thereof; the consummation of the transaction contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, except for such consents, waivers, approvals, Orders, Licenses, authorizations, declarations, filings and notifications (A) that have already been obtained or made or (B) of which the failure to have obtained or made would not reasonably be expected to prevent or materially delay the ability of Purchaser to perform or consummate the transaction contemplated by this Agreement.

(b)     None of the execution and delivery by Purchaser of this Agreement or any of the Purchaser Documents, the consummation of the transaction contemplated by this Agreement by Purchaser, or compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or a default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of, any contract or agreement to which Purchaser is a party or by which any of the properties or assets of Purchaser are bound, other than any such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transaction contemplated by this Agreement.

6.4     Litigation.     There are no Legal Proceedings pending or, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Authority, which, if adversely determined, would reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transaction contemplated hereby. Purchaser is not subject to any Order of any Governmental Authority except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or the ability of Purchaser to consummate the transaction contemplated hereby.

6.5     Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Purchaser in connection with the transaction contemplated by this Agreement and no Person is entitled to any fee or commission or like payment with respect to Seller in respect thereof.

-12-

6.6    Acknowledgement Regarding Condition of the Property.

(a)    Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges and agrees that Seller is not making any representations or warranties whatsoever, express or implied, beyond those expressly given by Seller to Purchaser in Article V hereof, and Purchaser acknowledges and agrees that, except for the representations and warranties contained therein, the Property is being transferred to Purchaser on a "WHERE IS" and, as to condition, "AS IS" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of Seller set forth in Article V hereof. Purchaser further represents that neither Seller nor any of its affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding Seller, the Property, the transaction contemplated by this Agreement, the OC Joint Venture or the OC Property not expressly set forth in this Agreement, and neither Seller, any of its affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its Representatives or the use by Purchaser or any of its affiliates of, any such information, including, without limitation, any confidential memoranda distributed on behalf of Seller relating to the Property or other publications or data room information provided to Purchaser or its Representatives, or any other document or information in any form provided to Purchaser or its Representatives in connection with the sale of the Property and the transaction contemplated hereby. Purchaser acknowledges that it, along with its Representatives, has conducted or, as of the Closing Date, will have conducted, to its satisfaction, its own independent investigation of the Property and, in making the determination to proceed with the transaction contemplated by this Agreement, Purchaser has, or will have, relied on the results of its own independent investigation. **WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE ANY REPRESENTATION RELATING TO THE OC PROPERTY REGARDING SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, COMPLIANCE WITH ZONING LAWS, OR ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES RELATING TO THE USE THEREOF, EXCEPT AS EXPRESSLY STATED HEREIN. PURCHASER ALSO ACKNOWLEDGES AND AGREES THAT THE INSPECTION AND INVESTIGATION OF THE OC PROPERTY BY PURCHASER AND ITS REPRESENTATIVES HAS BEEN ADEQUATE TO ENABLE PURCHASER TO MAKE ITS OWN DETERMINATION WITH RESPECT TO THE SUITABILITY OR FITNESS OF THE OC PROPERTY, INCLUDING WITH RESPECT TO SOIL CONDITIONS, AVAILABILITY OF UTILITIES, DRAINAGE, ZONING LAWS, ENVIRONMENTAL LAWS, AND ANY OTHER FEDERAL, STATE OR LOCAL STATUTES, CODES, REGULATIONS OR ORDINANCES. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PROPERTY IS BEING SOLD BY SELLER, AND PURCHASER AGREES TO ACCEPT THE PROPERTY, IN "AS-IS" AND "WHERE-IS" CONDITION ON THE CLOSING DATE. PURCHASER ACKNOWLEDGES, REPRESENTS AND WARRANTS THAT (I) PURCHASER HAS HAD AN OPPORTUNITY TO MAKE AN INDEPENDENT INVESTIGATION AND EXAMINATION OF THE OC PROPERTY (AND ALL MATTERS RELATED THERETO), AND TO BECOME FULLY FAMILIAR WITH THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE OC PROPERTY,**

-13-

AND (II) SELLER AND ITS EMPLOYEES, RESIDENTS, INTERNS, FELLOWS, AGENTS, MEMBERS, DIRECTORS, AND OFFICERS HAVE NOT MADE AND SHALL NOT MAKE ANY VERBAL OR WRITTEN REPRESENTATIONS, WARRANTIES OR STATEMENTS OF ANY NATURE OR KIND WHATSOEVER TO PURCHASER, WHETHER EXPRESS OR IMPLIED, WITH RESPECT TO THE ABOVE, AND, IN PARTICULAR, EXCEPT AS EXPRESSLY SET FORTH HEREIN, NO REPRESENTATIONS OR WARRANTIES HAVE BEEN MADE OR SHALL BE MADE WITH RESPECT TO (A) THE PHYSICAL CONDITION OR OPERATION OF THE OC PROPERTY, INCLUDING THE EXISTENCE OF ANY ENVIRONMENTAL HAZARDS OR CONDITIONS THEREON (INCLUDING THE PRESENCE OF ASBESTOS OR ASBESTOS CONTAINING MATERIALS OR THE RELEASE OR THREATENED RELEASE OF HAZARDOUS SUBSTANCES), (B) THE REVENUES OR EXPENSES OF THE OC PROPERTY, AND (C) THE ZONING AND OTHER LEGAL REQUIREMENTS APPLICABLE TO THE OC PROPERTY OR THE COMPLIANCE OF THE OC PROPERTY THEREWITH, (D) THE NATURE AND EXTENT OF ANY MATTER AFFECTING TITLE TO THE REAL ESTATE OR TO ANY PERSONALTY, (E) THE QUANTITY, QUALITY, OR CONDITION OF THE PERSONALTY, OR (F) ANY OTHER MATTER OR THING AFFECTING OR RELATING TO THE PROPERTY, OR ANY PORTION THEREOF, THE INTERESTS THEREIN TO BE CONVEYED TO PURCHASER PURSUANT TO THE TERMS OF THE TRANSACTION CONTEMPLATED HEREBY. THE FOREGOING SHALL NOT, IN ANY WAY, AFFECT PURCHASER'S RIGHTS UNDER ARTICLE XII HEREOF. PURCHASER ACKNOWLEDGES THAT THE DISCLAIMERS, AGREEMENTS AND OTHER STATEMENTS SET FORTH IN THIS PARAGRAPH ARE AN INTEGRAL PORTION OF THIS AGREEMENT.**

(b)    Except as set forth in this Agreement, Seller hereby specifically disclaims any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in Section 6.6(a) above and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Property. Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto. Seller acknowledges that the foregoing shall not affect Purchaser's rights under Article XII hereof.

6.7    Financial Ability To Close.  Purchaser, as of the Closing Date, will have the financial ability to close and the ability to do so as outlined in this Agreement.

6.8    No Other Representations or Warranties.  Except for the representations and warranties contained in this Article VI, neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to Purchaser or the transaction contemplated by this Agreement, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any affiliate of Purchaser or any of its officers, directors, employees, agents or other Representatives.  Except for the representations and warranties

-14-

contained in this Article VI, Purchaser disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Seller by any director, officer, employee, agent, consultant, or other Representative of Purchaser or any of its affiliates). The representations and warranties of Purchaser are for diligence purposes only and do not survive the Closing; however, its disclaimers survive.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

7.1     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or otherwise better competing bids (each a "Competing Bid").

(b)     Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Property, Seller shall enter into a customary confidentiality agreement with such Person on terms reasonably acceptable to Seller.

(c)     Following the entry of the Bidding Procedures Order by the Bankruptcy Court and until the transaction contemplated by this Agreement is consummated, Seller is permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Representatives) in connection with any sale or other disposition of all or any part of the Property. In addition, during such time period, Seller has the responsibility and obligation to respond to any inquiries or offers to purchase the Property and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Property to prospective purchasers.

7.2     Bankruptcy Court Filings. As promptly as practicable following the execution of this Agreement, but in no event later than ten (10) Business Days after the execution of this Agreement, Seller shall file and seek the approval of the Bankruptcy Court of the Sale Motion and the Bidding Procedures Order. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and a finding of adequate assurance of future performance by Purchaser, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order or the Bidding Procedures Order shall be appealed, each party shall use their respective commercially reasonable efforts to defend against such appeal. In the event that an appeal is taken, or a stay pending appeal is requested from the Sale Order or the Bidding Procedures Order, Seller shall promptly notify Purchaser of such appeal or stay request and shall provide Purchaser within three (3) Business Days a copy of the relevant notice of appeal or order of stay.

-15-

Seller shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.

7.3     Notice of Sale. Notice of the sale of the Property contemplated in this Agreement shall be in a form reasonably acceptable to Purchaser and be served in accordance with applicable Law (including, to the extent applicable, Rules 2002, 3016, 3017 and 6004 of the Federal Rules of Bankruptcy Procedure and any local rules or orders of the Bankruptcy Court) and the Bidding Procedures Order on all Persons required to receive notice under applicable Law.

## ARTICLE VIII
## COVENANTS

8.1     Access to Information. Subject to the other provisions of this Article 8, Seller agrees that, prior to the Closing Date, Purchaser shall be entitled, through its Representatives, to make such investigation of Seller and the Property and such examination of the books and records of Seller pertaining to the Property, and the Assumed Liabilities as it reasonably requests and to make extracts and copies of such books and records; it being understood, however, that the foregoing shall not entitle Purchaser to access any books, records or documents the disclosure of which by Seller to Purchaser would violate (A) any agreement or obligation of confidentiality to which Seller is a party or is bound prior to the date hereof or (B) any obligation of confidentiality by which Seller is bound under applicable Law. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, any request for such examination shall be made to one a Persons, identified by Seller in advance to the receipt of such request, and any access to any information concerning the Property by Purchaser must be approved by one of such Persons, and Purchaser's access to such information shall be subject to any restrictions on disclosure by Seller to Purchaser or use of the information contained therein by Purchaser applicable pursuant to any agreement to which Seller is a party or is bound prior to the date hereof or under applicable Law. Seller shall cause its Representatives to cooperate with Purchaser and its Representatives in connection with such investigation and examination, and Purchaser and its Representatives shall cooperate with Seller and its Representatives and shall use its commercially reasonable efforts to minimize any disruption to Seller's business and operations, including the Property. Notwithstanding anything herein to the contrary, Seller shall not be required to permit any such investigation or examination if, and to the extent that, Seller, upon advice of counsel, determines that such investigation or examination by Purchaser would or is reasonably likely to result in a loss of any attorney-client or attorney work product privilege available to Seller.

8.2     Ownership of the Property Pending the Closing.

(a)     Prior to the Closing, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall use its commercially reasonable efforts without requirement of funding additional expenses to comply in all material respects with the operating agreement of Arbowest and all Laws and Orders pertaining to the Property;

-16-

(b)     Except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement, or (3) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), Seller shall not, solely as it relates to the Property:

(i)     subject the Property to any Lien provided, however, that nothing herein shall prevent Seller from granting any Lien on the Property in connection with any debtor-in- possession financing approved by the Bankruptcy Court;

(ii)     claim or waive or release any material right of Seller with respect to the Property except in the Ordinary Course of Business;

(iii)     agree to do anything prohibited by this Section 8.2(b).

(c)     Seller shall notify Purchaser of any written notice received by Seller prior to Closing from any party to a Material Contract with Arbowest or OC Joint Venture that such party is in default thereunder or in breach thereof, which default or breach remains uncured, or any notice of termination thereof. For purposes of this Agreement, a "Material Contract" means any contract which is not terminable by either party upon less than 60 days notice and which evidences a payment obligation of Seller in excess of $50,000.

8.3     Consents and Licenses; Insurance.

(a)     Seller shall use its commercially reasonable efforts, and Purchaser shall cooperate with Seller, including, without limitation, by taking the actions referred to in Section 8.4, to obtain at the earliest practicable date all consents, approvals, authorizations, waiver and Orders required to be obtained by Seller and to give at the earliest practicable date any notices required to be given by Seller, in order for Seller to consummate the transaction contemplated by this Agreement on the terms and in the manner provided hereby; provided, however, that Seller shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such item except as otherwise provided by Section 8.4. Purchaser shall use its commercially reasonable efforts, and Seller shall cooperate with them, including by taking the actions referred to in Section 8.4 to obtain at the earliest practicable date all consents, approvals, authorizations, waivers, Orders, and licenses required to be obtained by Purchaser, and to give at the earliest practicable date any notices required to be given by Purchaser, in order for Purchaser to consummate the transaction contemplated by this Agreement on the terms and in the manner provided hereby and to own the Property after the Closing; provided, however, that Purchaser shall not be obligated to pay any consideration therefor to any third party from whom any such item is requested (other than filing or application fees payable to any Governmental Authority) or to initiate any litigation or legal proceedings to obtain any such consent or approval except as otherwise provided by Section 8.4. Other than Cure Amounts to be paid by Purchaser pursuant to Section 2.5, nothing contained herein shall require Seller to expend any funds in order to remove or eliminate any Lien on the Property in order to deliver the Property to Purchaser pursuant to this Agreement free of any such Lien;

(b)     As of the Closing, Purchaser shall have appropriate insurance coverage in place for the Property consistent with what would be maintained under good industry business practices.

8.4     Consents and Approvals.

(a)     The parties recognize and agree that time is of the essence for the closing of the transaction contemplated by this Agreement. Purchaser shall cooperate with Seller, on an expedited basis, in making all required notices and applications, so that the parties may receive all approvals required to consummate the transaction contemplated by this Agreement.

(b)     Each of Purchaser and Seller shall use its reasonable best efforts to furnish to each other all information required for any application or other filing to be made pursuant to any applicable Law in connection with the transaction contemplated by this Agreement. Each such party shall promptly inform the other party of any material oral communication with, and provide copies of written communications with, any Governmental Authority regarding any such filings or any such transaction. Neither party shall independently participate in any formal meeting with any Governmental Authority in respect of any such filings, investigation, or other inquiry without giving the other party prior notice of the meeting and, to the extent permitted by such Governmental Authority, the opportunity to attend and/or participate.

8.5     Further Assurances. Each party shall use its commercially reasonable efforts to (i) take all actions necessary or appropriate to consummate the transaction contemplated by this Agreement and (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transaction contemplated by this Agreement.

8.6     Confidentiality. From and after the date hereof, Purchaser shall, and shall cause its Representatives to maintain in confidence, not disclose to any third party without the prior written consent of Seller, and not use to the detriment of Seller, any Confidential Information relating to or obtained from Seller or its Representatives. For purposes of this Section 8.6, "Confidential Information" shall mean any information that is confidential or proprietary in nature that is related to the Assumed Liabilities or the Property; provided, however, that Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Purchaser or any of its Representatives, (ii) becomes available to Purchaser on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Purchaser to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Purchaser from a third party having the right to disseminate Confidential Information without restriction on disclosure or (iv) can be shown by Purchaser through written documents or evidence maintained by Purchaser to have been independently developed by either of them; and provided further, that upon the Closing by Purchaser, the restrictions contained in this Section 8.6 shall not apply to confidential or proprietary information related primarily to the Property and the Assumed Liabilities. Purchaser may disclose any of Confidential Information to its Representatives who need to know it for the purpose of effectuating the transaction contemplated by this Agreement and who agree to keep it confidential. Purchaser shall instruct its Representatives having access to Confidential Information of such obligation of confidentiality. If Purchaser or anyone to whom it has

-18-

transmitted Confidential Information subject to the confidentiality obligations herein becomes legally compelled to disclose any of such Confidential Information, Purchaser shall provide the respective Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or such Seller waives compliance with the provisions of this Section 8.6, Purchaser shall furnish only that portion of Confidential Information that it is advised by written opinion of counsel is legally required to be disclosed. The obligations contained in this Section 8.6 shall survive the Closing and are in addition to any separate confidentiality agreements between Seller and Purchaser.

8.7    Publicity. Each of Seller and Purchaser agrees that it shall not issue any written press release concerning this Agreement or the transaction contemplated hereby without obtaining the prior written approval of either Purchaser or Seller, as applicable, which approval will not be unreasonably withheld, delayed or conditioned, unless, in the judgment of such issuing party upon advice of counsel, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided that such party that intends to make such release shall use its commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other parties with respect to the text thereof.

8.8    Cooperation. Seller and Purchaser agrees to reasonably cooperate with each other, from the date hereof up through and following the Closing Date, in good faith, in an effort to satisfy all further conditions, undertakings and agreements contained in this Agreement.

**ARTICLE IX**
**RESERVED**

**ARTICLE X**
**CONDITIONS TO CLOSING**

10.1    Conditions Precedent to Obligations of Purchaser. The obligations of Purchaser to consummate the transaction contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (without giving effect to any materiality or material adverse effect qualifiers set forth therein) at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date) and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the foregoing effect, provided, however, that in the event any such representation or warranty has been breached the condition set forth in this Section 10.1(a) shall nevertheless be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in a material adverse effect;

(b)     Seller shall have performed and complied in all respects with all obligations and agreements required in this Agreement to be performed or complied with by it prior to the Closing Date and Purchaser shall have received a certificate signed by an authorized officer of Seller, dated the Closing Date, to the forgoing effect;

(c)     Seller shall have delivered, or caused to be delivered, to Purchaser all of the items set forth in Section 4.2; and

10.2     Conditions Precedent to Obligations of Seller.  The obligation of Seller to consummate the transaction contemplated by this Agreement is subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Seller in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Purchaser set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing Date as though made on the Closing Date, except to the extent such representations and warranties relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date), and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b)     Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing Date, and Seller shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c)     Purchaser shall have delivered, or caused to be delivered, to Seller all of the items set forth in Section 4.3.

10.3     Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of the parties to consummate the transaction contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and Seller in whole or in part to the extent permitted by applicable Law):

(a)     There shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transaction contemplated by this Agreement;

(b)     The Bankruptcy Court shall have entered the Bidding Procedures Order; and

(c)     The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a final and non order not subject to any stay.

10.4     Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, to excuse it from

-20-

consummating the transaction contemplated by this Agreement if such failure was caused by such party's failure to comply with any provision of this Agreement.

## ARTICLE XI
## TAXES

11.1 <u>Transfer Taxes</u>. Purchaser shall pay any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transaction contemplated by this Agreement, if any ("<u>Transfer Taxes</u>"). Seller shall, however, seek to include in the Sales Order a provision that provides that the transfer of the Property shall be free and clear of any Transfer Taxes under Bankruptcy Code Section 1146(c). The parties shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes, including a refund available under Section 1146(c) of the Bankruptcy Code.

11.2 <u>Cooperation on Tax Matters</u>. The parties shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Property and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any tax return, claim for refund or other filings relating to Tax matters, for the preparation for any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters.

## ARTICLE XII
## MISCELLANEOUS

12.1 <u>Expenses</u>. Except as otherwise provided in this Agreement, each party shall bear its own expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transaction contemplated hereby and thereby.

12.2 <u>Injunctive Relief</u>. Damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any party hereto shall be entitled to injunctive relief with respect to any such breach, including specific performance of such covenants, promises or agreements or an order enjoining a party from any threatened, or from the continuation of any actual breach of the covenants, promises or agreements contained in this Agreement. The rights set forth in this <u>Section 12.2</u> shall be in addition to any other rights which a party may have at law or in equity pursuant to this Agreement.

12.3 <u>Submission to Jurisdiction Consent to Service of Process</u>. Without limiting any party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transaction contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.6</u> hereof; <u>provided</u>, <u>however</u>,

-21-

that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court sitting in Dallas County, Texas, or the district court for the State of Texas sitting in Dallas County and any appellate court from any thereof, for the resolution of any such claim or dispute. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.6.

12.4    Entire Agreement: Amendments and Waivers.  This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

12.5    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona applicable to contracts made and performed in such State.

12.6    Notice.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), or (ii) one business day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Purchaser to:                        If to Seller, to:

Arbeit Investment Limited Partnership      Opus West Corporation
10350 Bren Road West                       2555 East Camelback Road
Minnetonka, MN 55343                       Suite 800
Attn:  Suzanne Flannigan                   Phoenix, AZ 85016
                                           Attn:  John Greer

-22-

12.7    Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transaction contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transaction contemplated hereby are consummated as originally contemplated to the greatest extent possible.

12.8    Binding Effect Assignment. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns. A successor to Seller shall include Seller as a reorganized debtor. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below. No assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void; provided, however, that Purchaser may assign its right to acquire any or all of the Property and its other rights hereunder to an entity wholly owned by it that also assumes all of Purchaser's obligations hereunder (but such assumption shall not relieve Purchaser of its obligations hereunder) with the consent of Seller, which shall not be unreasonably withheld; and provided further, Purchaser may assign its right to acquire any or all of the Property to a third Person at Closing. Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context otherwise requires. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.

12.9    No Personal Liability. In entering into this Agreement, the parties understand, agree and acknowledge that no director, trustee, officer, manager, member, employee, shareholder, attorney, accountant, advisor or agent of any party hereto shall be personally liable or responsible to any other party or its Affiliates, directors, trustees, officers, managers, members, employees, shareholders, attorneys, accountants, advisors or agents for the performance of any obligation under this Agreement of any party to this Agreement or the truth, completeness or accuracy of any representation or warranty contained in, or statement made in, this Agreement or any document prepared pursuant hereto and that all obligations hereunder are those of the named parties only.

12.10   Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

-23-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

**OPUS WEST CORPORATION**

By: _____
Its: _____

**PURCHASER:**

**ARBEIT INVESTMENT LIMITED PARTNERSHIP**
By: Adler Management Corporation, General Partner

By: _____
Its: _____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

*DAL 77,446,490.1*

# SUPPLEMENT TO ASSET PURCHASE AGREEMENT

THIS SUPPLEMENT TO ASSET PURCHASE AGREEMENT (this "Supplement") is made and entered into as of July 1, 2009, by and between Opus West Corporation, a Minnesota corporation ("Seller"), and Arbeit Investment Limited Partnership, a Delaware limited partnership ("Purchaser"). Capitalized terms used herein and not otherwise defined herein have the meanings given such terms in the Asset Purchase Agreement (the "Asset Purchase Agreement") between Seller and Purchaser dated of even date herewith.

W I T N E S S E T H:

WHEREAS, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to Sections 363 and 365 of the Bankruptcy Code all of the Property and Assumed Liabilities, all as more specifically provided in that certain Asset Purchase Agreement defined above;

WHEREAS, the parties desire to agree to certain terms regarding payment of a break-up fee to Purchaser in the event the Closing does not occur pursuant to certain terms set forth in the Asset Purchase Agreement;

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements hereinafter contained both in this Supplement and the Asset Purchase Agreement, the parties hereby agree as follows:

1.1    Break-Up Fee. In the event the Closing of the transaction contemplated by the Asset Purchase Agreement does not occur due to termination pursuant to Section 4.4(c)(ii) of the Asset Purchase Agreement, Seller shall pay Purchaser a break-up fee of Fifty-One Thousand Dollars ($51,000.00) (the "Break-Up Fee"), which amount represents three percent (3%) of the Purchase Price less Cure Amounts and Transfer Taxes. This Break-Up Fee shall be paid by Seller to Purchaser within sixty (60) days following demand thereof by Purchaser to Seller.

1.2    Terms and Conditions. To the extent not specifically provided for in this Supplement, the terms and conditions of this Supplement shall be governed by the terms and conditions set forth in the Asset Purchase Agreement.

1.3.    Entire Agreement: Amendments. This Supplement and the Asset Purchase Agreement represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof. This Supplement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Supplement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

1.4    Counterparts. This Supplement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Supplement and all of which, when taken together, will be deemed to constitute one and the same agreement.

*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK*

DAL 77,583,572v1

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**


**OPUS WEST CORPORATION**

By: _____

Its: _____
     John W. Greer
     President


**PURCHASER:**


**ARBEIT INVESTMENT LIMITED PARTNERSHIP**
By: Adler Management Corporation, General Partner


    By: _____

    Its: _____


[SIGNATURE PAGE TO SUPPLEMENT]

DAL 77,583,572v1

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLER:**

OPUS WEST CORPORATION

By: _____

Its: _____

**PURCHASER:**

**ARBEIT INVESTMENT LIMITED PARTNERSHIP**
By: Adler Management Corporation, General Partner

By: _____

Its: _____

[SIGNATURE PAGE TO SUPPLEMENT]

DAL 77,583,572v1