THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN.   ACCEPTANCE MAY NOT BE
SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY
COURT.  THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR APPROVAL, BUT HAS NOT
YET BEEN APPROVED BY THE BANKRUPTCY COURT

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| **OPUS WEST CORPORATION**, *et al.*,[1] | Case No. 09-34356-hdh-11 |
| Debtors. | Jointly Administered |

### DISCLOSURE STATEMENT IN SUPPORT OF JOINT CHAPTER 11 PLAN OF LIQUIDATION OF OPUS WEST CORPORATION, OPUS WEST CONSTRUCTION CORPORATION, AND OPUS WEST LP, DATED AS OF NOVEMBER 25, 2009

**November 25, 2009**

Clifton R. Jessup, Jr.
State Bar No. 10655020
Bruce H. White
State Bar No. 21288850
Bryan L. Elwood
State Bar No. 24029535
GREENBERG TRAURIG, LLP
2200 Ross Ave., Suite 5200
Dallas, Texas 75201
Telephone: 214-665-3600
Facsimile: 214-665-5938

*Counsel for Opus West Corporation and
Opus West Construction Corporation*

Peter Franklin
State Bar No. 07378000
Doug Skierski
State Bar No. 24008046
Erin K. Lovall
State Bar No. 24032553
FRANKLIN SKIERSKI
   LOVALL HAYWARD, LLP
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231
Telephone: 972-755-7100
Facsimile: 972-755-7110

*Counsel for Opus West LP*

---

[1]  The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:
Opus West Corporation (1533); Opus West Construction Corporation (5917); Opus West LP (5535); Opus West
Partners, Inc. (5537); and O.W. Commercial, Inc. (9134).

> *This Disclosure Statement and the documents accompanying it contain a number of defined terms, which are denoted with capital letters. Please refer to Section 2.1 of the Plan for a complete listing and definitions of the capitalized terms used herein.*

This Disclosure Statement (the "**Disclosure Statement**") describes the *Joint Chapter 11 Plan of Liquidation of Opus West Corporation, Opus West Construction Corporation, and Opus West LP, Dated as of November 25, 2009* (the "**Plan**"), which has been filed with this Disclosure Statement in the jointly administered Chapter 11 cases of Opus West Corporation ("**Opus West**"), Opus West Construction Corporation ("**OWCC**"), and Opus West LP ("**OWLP**," and collectively with Opus West and OWCC, the "**Debtors**")[2] currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**" or "**Court**"). A copy of the Plan is attached hereto as <u>Appendix "1"</u> and is incorporated herein by reference as if fully set forth herein.

**If you have a Claim against the Debtors, you should read this Disclosure Statement and the Plan carefully. The Debtors urge all holders of Claims in Impaired Classes receiving Ballots to accept the Plan.**

This Disclosure Statement (and the other appendices hereto), the Plan, the accompanying forms of Ballot, if any, and the related materials delivered together herewith are being furnished by the Debtors to holders of Impaired Claims pursuant to 11 U.S.C. § 1125, in connection with the solicitation by the Debtors of votes to accept or reject the Plan (and the transactions contemplated thereby), as described herein.

This Disclosure Statement is designed to provide adequate information to enable holders of Claims against the Debtors to make an informed judgment on the Plan. All Creditors are encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the Appendices annexed hereto, and other documents referenced as filed with the Bankruptcy Court before or concurrently with the filing of this Disclosure Statement. Furthermore, the projected financial information contained herein has not been the subject of an audit. Subsequent to the date hereof, there can be no assurance (1) that the information and representations contained herein will continue to be materially accurate, or (2) that this Disclosure Statement contains all material information.

All holders of Impaired Claims should read and consider carefully the matters described in the Plan and Disclosure Statement as a whole, including the "RISK FACTORS" set forth below, prior to voting on the Plan. In making a decision to accept or reject the Plan, each Creditor must rely on its own examination of the Debtors as described in this Disclosure Statement and the terms of the Plan, including the merits and risks involved. In addition, Confirmation and consummation of the Plan are subject to conditions precedent that could lead

---

[2] For the avoidance of doubt, the term "Debtors" as used in the Plan and this Disclosure Statement does not include O.W. Commercial, Inc. or Opus West Partners, Inc., each of which are expressly excluded from the terms of the Plan and shall be administered separate and apart from the provisions of the Plan.

to delays in consummation of the Plan. There can be no assurance that each of these conditions precedent will be satisfied or waived (as provided in the Plan) or that the Plan will be consummated. Even after the Effective Date, Distributions under the Plan may be subject to substantial delays for holders of Disputed Claims.

This Disclosure Statement has been conditionally approved by order of the Bankruptcy Court as containing adequate information of a kind and in sufficient detail to enable holders of Claims to make an informed judgment with respect to voting to accept or reject the Plan. However, the Bankruptcy Court's conditional approval of this Disclosure Statement does not constitute a recommendation or determination by the Bankruptcy Court with respect to the merits of the Plan.

With the exception of historical information, some matters discussed herein, including the projections and valuation analysis described herein are "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward looking statements are subject to risks, uncertainties, and other factors which could cause actual results to differ materially from future results expressed or implied by such forward looking statements.

No party is authorized by the Debtors to give any information or make any representations with respect to the Plan other than that which is contained in this Disclosure Statement. No representation or information concerning the Debtors, their future business operations or the value of their respective properties has been authorized by the Debtors, other than as set forth herein. Any information or representation given to obtain your acceptance or rejection of the Plan that is different from or inconsistent with the information or representations contained herein and in the Plan should not be relied upon by any holders of Claims in voting on the Plan.

This Disclosure Statement has been prepared in accordance with 11 U.S.C. § 1125 and not in accordance with federal or state securities laws or other applicable non-bankruptcy law. Entities holding or trading in or otherwise purchasing, selling, or transferring Claims against, Interests in, or securities of, the Debtors should evaluate this Disclosure Statement only in light of the purpose for which it was prepared.

This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "**Commission**") or by any state securities commission or similar public, governmental, or regulatory authority, and neither such Commission nor any such authority has passed upon the accuracy or adequacy of the statements contained herein.

This Disclosure Statement shall neither be admissible in any other proceeding involving the Debtors or any other party nor be construed to be providing any legal, business, financial, or tax advice. Each holder of a Claim or Interest should, therefore, consult with its own legal, business, financial, and tax advisors as to any such matters concerning the solicitation, the Plan, or the transactions contemplated thereby.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the summaries thereof contained in this Disclosure Statement.

## INCORPORATION OF DOCUMENTS BY REFERENCE

This Disclosure Statement incorporates by reference certain documents relating to the Debtors that are not presented herein or delivered herewith. The following documents are incorporated by reference herein in their entirety:

The Debtors' respective *Schedules of Assets and Liabilities*, each filed on August 10, 2009, including all amendments and restatements thereto filed through the date of the conditional approval of this Disclosure Statement (collectively, the "**Schedules**").

The Debtors' respective *Statements of Financial Affairs*, each filed on August 10, 2009, including all amendments and restatements thereto filed through the date of the approval of this Disclosure Statement (collectively, the "**SOFAs**").

The Debtors' respective Monthly Operating Reports, including any amendments thereto, filed through the date of the approval of this Disclosure Statement (collectively, the "**MORs**").

The *Joint Chapter 11 Plan of Liquidation of Opus West Corporation, Opus West Construction Corporation, and Opus West LP, Dated as of November 25, 2009* filed contemporaneously herewith.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein modifies or supersedes such statement.

## AVAILABLE INFORMATION

Documents Filed in the Case are available at the following Web site: http://www.txnb.uscourts.gov/.

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY ................................................................. 1
     A.     The Solicitation. ....................................................................................... 1
     B.     Recommendation. ..................................................................................... 2
     C.     Summary of the Plan ................................................................................ 2
     D.     General. ..................................................................................................... 6
     E.     Classification and Treatment of Claims and Interests Generally. ........... 6
     F.     Good Faith Solicitation Under Section 1125. .......................................... 7
     G.     Votes Required for Acceptance; Confirmation. ....................................... 8
     H.     Sources of Information. ............................................................................ 9

II.     BACKGROUND. ................................................................................................ 9
     A.     Overview of the Debtors. ......................................................................... 9
     B.     Debtors' Pre-Petition Efforts to Restructure. ....................................... 10
     C.     Pre-Petition Retention of Professionals. ............................................... 10

III.     THE CHAPTER 11 CASE. ............................................................................... 11
     A.     Continuation of Business; Stay of Litigation. ...................................... 11
     B.     Significant Events During the Case. ...................................................... 11

IV.     RISK FACTORS .............................................................................................. 14
     A.     Risks Related to Projections and Estimates .......................................... 15
     B.     Objection to Classifications .................................................................. 15
     C.     Risk of Nonconfirmation of the Plan .................................................... 15
     D.     Nonoccurrence of Effective Date of the Plan. ...................................... 16

V.     CONFIRMATION OF THE PLAN .................................................................. 16
     A.     Voting Procedures and Requirements. ................................................... 16
     B.     Acceptance. ............................................................................................ 18
     C.     Confirmation of the Plan. ...................................................................... 18
     D.     Non-Acceptance and Cramdown. .......................................................... 20
     E.     Confirmation Hearing. ........................................................................... 21

VI.     ALTERNATIVES TO CONFIRMATION OF THE PLAN .............................. 21
     A.     Liquidation Under Chapter 7. ................................................................ 21
     B.     Alternative Plan. .................................................................................... 22

VII.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES ............................. 22

VIII.     SECURITIES LAWS CONSEQUENCES OF PLAN ...................................... 22

IX.     CONCLUSION AND RECOMMENDATION ................................................. 22

# APPENDICES

Appendix "1":  Debtors' Joint Chapter 11 Plan of Liquidation

Appendix "2":  Liquidation Budgets

## I.     INTRODUCTION AND SUMMARY

The following introduction and summary is qualified in its entirety by, and should be read in conjunction with, the more detailed information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement. References herein to a "fiscal" year refer to the fiscal year of the Debtors ending the last day of December in the calendar year indicated. Unless otherwise stated herein, references to "**Section**" or "**§**" are to Title 11 of the United States Code (the "**Bankruptcy Code**").

### A.     The Solicitation.

On November 25, 2009, the Bankruptcy Court conditionally determined that this Disclosure Statement contains "adequate information" in accordance with Section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1), "adequate information" is defined as "information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the Debtors and the condition of the Debtors' books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant Class to make an informed judgment about the Plan."

The Bankruptcy Court has scheduled a hearing to consider final approval of this Disclosure Statement and Confirmation of the Plan on January __, 2010, at __:__ _.m. (Prevailing Texas Time). The hearing may be adjourned from time to time without further notice other than by announcement in the Bankruptcy Court on the scheduled date of such hearing. Any objections to Confirmation of the Plan must be in writing and must be Filed with the Clerk of the Bankruptcy Court and served on the counsel listed below to ensure actual receipt by them on or before _____ __, 20__, at 4:30 p.m. (Prevailing Texas Time). Federal Rule of Bankruptcy Procedure 3007 governs the form of any such objection. Counsel on whom objections must be served are:

| Counsel for Debtor Opus West Corporation and Opus West Construction Corporation: | Counsel for the Committee: |
| --- | --- |
| Clifton R. Jessup, Jr.<br>Bruce H. White<br>Greenberg Traurig, LLP<br>2200 Ross Ave., Suite 5200<br>Dallas, Texas 75201<br>(214) 665-3600 | Deirdre B. Ruckman<br>Gardere Wynne Sewell LLP<br>1601 Elm Street, Suite 3000<br>Dallas, Texas 75201<br>(214) 999-3000 |
| Counsel for Debtor Opus West LP: | Office of the U.S. Trustee: |
| Peter Franklin<br>Doug Skierski<br>Franklin Skierski Lovall Hayward, LLP<br>10501 N. Central Expressway, Suite 106<br>Dallas, Texas 75231<br>(972) 755-7100 | George F. McElreath<br>Office of The United States Trustee<br>Earle Cabell Federal Building<br>1100 Commerce Street, Room 976<br>Dallas, Texas 75242<br>(214) 767-8967 |

**B.**     **Recommendation.**

THE DEBTORS URGE ALL CREDITORS TO VOTE TO ACCEPT THE PLAN.

The Debtors believe that (1) the Plan provides the best possible result for the holders of Claims against the Debtors, (2) with respect to each Impaired Class of Claims, the Distributions under the Plan are greater than the amounts that would be received if the Debtors were to liquidate under Chapter 7 of the Bankruptcy Code, and (3) acceptance of the Plan is in the best interest of holders of Claims.

In arriving at its conclusions, the Debtors considered (1) the limited alternatives available to the Debtors to restructure their debts, (2) the Debtors' estimated liquidation value, and (3) the rights, in both payment and security position, of the Debtors' creditors.

**C.**     **Summary of the Plan.**

In order to provide a Distribution to holders of General Unsecured Claims, the Plan, which is attached hereto as Appendix "1" and incorporated here by reference, contemplates the liquidation of the Debtors and the resolution of certain Claims through a series of mechanisms described more fully in the Plan. After the Effective Date, the Plan and all remaining property of each Debtor's Estate shall be managed under the direction of the Surviving Officer, in consultation with the Oversight Committee, as provided by the terms of the Plan. The Surviving Officer shall make all Distributions as and when provided for under the Plan.

As set forth in the Liquidation Budgets attached hereto as Appendix "2," the Debtors believe approval of the Plan will result in a higher recovery to unsecured creditors than if the Debtors' Estates were liquidated in a Chapter 7.

The following Tables set forth a summary reference guide to the classification and treatment of Allowed Claims against and Allowed Interests in each Debtor, and provides each Debtor's estimate of total Claims in each Class as of the Effective Date with respect to such Debtor. The following Tables are summaries only and are subject in all respects to the specific provisions of the Plan.

The Claims and Interests with regard to Opus West are as follows:

| \begin{center}CLASSES OF CLAIMS AND INTERESTS AGAINST OPUS WEST\end{center} | | | | | |
|---|---|---|---|---|---|
| Opus West Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery | Estimated Total Amount of Claims |
| 1 | Priority Non-Tax Claims Against Opus West | Paid in full in Cash on or as soon as practicable after the later of (a) the Effective Date, and (b) the date on which such Claim becomes Allowed. | Impaired. Entitled to vote. | 90% | $464,093.00 |
| 2 | Secured Claims Against Opus West | Return of any remaining Collateral securing such Claim in full satisfaction of the Claim.  Any Deficiency Claim shall be treated as an Opus West Class 4 General Unsecured Claim. | Unimpaired. Deemed to accept Plan. | 100% | Unknown[3] |
| 3 | Secured Tax Claims Against Opus West | Retention of Liens in related property. | Unimpaired. Deemed to accept Plan. | 100% | $0.00 |
| 4 | General Unsecured Claims Against Opus West | Paid *pro rata* share of remaining Opus West assets after liquidation. | Impaired. Entitled to vote. | Unknown | $855,996,280.00[4] |
| 5 | Interests in Opus West | No distribution. | Impaired. Deemed to reject Plan. | 0% | n/a |

[3]  The amount of any such Secured Claims against Opus West is unknown as the automatic stay has been lifted with regard to any related collateral and/or the collateral has been foreclosed upon.
[4]  The Debtors anticipate that the Claims in this Class that will ultimately be Allowed will be less than stated.

The Claims and Interests with regard to OWCC are as follows:

| CLASSES OF CLAIMS AND INTERESTS AGAINST OWCC | | | | | |
|---|---|---|---|---|---|
| OWCC Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery | Estimated Total Amount of Claims |
| 1 | Priority Non-Tax Claims Against OWCC | Paid in full in Cash on or as soon as practicable after the later of (a) the Effective Date, and (b) the date on which such Claim becomes Allowed. | Impaired. Entitled to vote. | 90% | $594,235.00 |
| 2 | Secured Claims Against OWCC | Return of any remaining Collateral securing such Claim in full satisfaction of the Claim. Any Deficiency Claim shall be treated as an OWCC Class 4 General Unsecured Claim. | Unimpaired. Deemed to accept Plan. | 100% | $0.00 |
| 3 | Secured Tax Claims Against Opus West | Retention of Liens in related property. | Unimpaired. Deemed to accept Plan. | 100% | $0.00 |
| 4 | General Unsecured Claims Against OWCC | Paid *pro rata* share of remaining OWCC assets after liquidation. | Impaired. Entitled to vote. | Unknown | $33,204,768.00[5] |
| 5 | Interests in OWCC | No distribution. | Impaired. Deemed to reject Plan. | 0% | n/a |

---

[5]  This amount includes $11,702,006.00 in approximate Claims asserted by holders of mechanics and materialmen Liens related to the 121 Lakepointe property sold pursuant to Court order, the net proceeds of which, after satisfying the Claims of the senior secured lender, total approximately $6,100,000.00.

The Claims and Interests with regard to OWLP are as follows:

| CLASSES OF CLAIMS AND INTERESTS AGAINST OWLP | | | | | |
|---|---|---|---|---|---|
| OWLP Class | Type of Allowed Claim or Interest | Treatment | Status | Estimated Recovery | Estimated Total Amount of Claims |
| 1 | Priority Non-Tax Claims Against OWLP | Paid in full in Cash on or as soon as practicable after the later of (a) the Effective Date, and (b) the date on which such Claim becomes Allowed. | Impaired. Entitled to vote. | 90% | $0.00 |
| 2 | Secured Claims Against OWLP | Return of any remaining Collateral securing such Claim in full satisfaction of the Claim. Any Deficiency Claim shall be treated as an OWLP Class 4 General Unsecured Claim. | Unimpaired. Deemed to accept Plan. | 100% | $0.00 |
| 3 | Secured Tax Claims Against OWLP | Retention of Liens in related property. | Unimpaired. Deemed to accept Plan. | 100% | $0.00 |
| 4 | General Unsecured Claims Against OWLP | Paid *pro rata* share of remaining OWLP assets after liquidation. | Impaired. Entitled to vote. | Unknown | $80,215,957.00[6] |
| 5 | Interests in OWLP | No distribution. | Impaired. Deemed to reject Plan. | 0% | n/a |

In addition to the foregoing, holders of mechanics and materialmen Liens related to the 121 Lakepointe property sold by OWLP pursuant to Court authority will receive, on account of their Allowed Claims (which the Debtors estimate will total approximately $10,000,000.00), a *pro rata* Distribution from approximately $6,100,000.00 in proceeds remaining from such sale

---

[6] This amount includes $11,702,006.00 in approximate Claims asserted by holders of mechanics and materialmen Liens related to the 121 Lakepointe property sold pursuant to Court order, the net proceeds of which, after satisfying the Claims of the senior secured lender, total approximately $6,100,000.00.

and currently being held by the Debtors. Any remaining Allowed Claims of holders of such mechanics and materialmen Liens remaining after such Distribution shall be a Deficiency Claim.

The Debtors estimate that they currently have the following respective approximate amounts available for Distribution and other payments contemplated under the Plan: (1) Opus West: $4,000,000.00; (2) OWCC: $1,089,000.00; and (3) OWLP: $35,000.00 (not including the approximately $6,100,000.00 referenced in the preceding paragraph).

**Any reference to the terms of the Plan, a copy of which is attached hereto as Appendix "1," set forth in this Disclosure Statement are qualified in entirety by reference to the more detailed information set forth in the Plan. To the extent that the terms of this Disclosure Statement vary from the terms of the Plan or the Plan Documents, the terms of the Plan and the Plan Documents shall control.**

### D. General.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, the Debtors are authorized to reorganize or liquidate their business for the benefit of themselves and their Creditors and Interest holders.

Formulation of a plan is the principal objective of Chapter 11. In general, a plan (1) divides Claims and Interests into separate classes, (2) specifies the property that each Class is to receive under the Plan, and (3) contains other provisions necessary to the reorganization of the Debtors. Alternatively, the Bankruptcy Code allows the Debtors to file a plan of liquidation which allows for the orderly liquidation of the assets of the Debtors.

Chapter 11 does not require each holder of a Claim or Interest to vote in favor of the Plan in order for the Bankruptcy Court to confirm the Plan. However, the Plan must be accepted by the holders of at least one Class of Claims that is Impaired without considering the votes of "insiders" within the meaning of the Bankruptcy Code. Distributions to be made under the Plan will be made after Confirmation of the Plan, on the Effective Date, or as soon thereafter as is practicable, or at such other time or times specified in the Plan.

### E. Classification and Treatment of Claims and Interests Generally.

Section 1123(a)(1) requires that the Plan classify all Claims (other than Administrative Expenses, Administrative Operating Expenses, and Priority Tax Claims) and Interests. Section 1122 provides that, except for certain Claims classified for administrative convenience, the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests of such Class. The Debtors believe they have classified all Claims and Interests in compliance with the provisions of Section 1122. If a Claim or Interest holder challenges such classification of Claims or Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Bankruptcy Court, intend to make such reasonable modifications to the classification of Claims or Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation.

**Except to the extent that such modification of classification adversely affects the treatment of a holder of a Claim or Interest and requires resolicitation, acceptance of the Plan by any holder of a Claim or Interest pursuant to this solicitation will be deemed to be a consent to the Plan's treatment of such holder of a Claim or Interest regardless of the Class to which such holder of a Claim or Interest is ultimately deemed to belong.**

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest in a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Debtors believe that the Plan complies with this standard. If the Bankruptcy Court finds that the Plan does not comply with this standard, it could deny Confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

The Plan categorizes Claims against and Interests in the Debtors under the Plan into three sets of Classes to distinguish between the Debtors. In accordance with the Bankruptcy Code, Administrative Expenses, Administrative Operating Expenses, and Priority Tax Claims are not classified into Classes. The Plan also provides that expenses incurred by the Debtors during the Case will be paid in full and specifies the treatment proposed for the Claims and Interests in each Class.

### F.        Good Faith Solicitation Under Section 1125.

The Plan provides that the Debtors, upon Confirmation of the Plan, shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code and that the Debtors (and its affiliates, agents, directors, officers, employees, members, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and therefore is not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

**The Debtors believe that the Plan treats the respective Classes of Claims and Interests fairly and equitably in observance of the absolute priority rule of Section 1129(b)(2) of the Bankruptcy Code. The Debtors believe that the Plan provides each Creditor and Interest holder with at least as much, if not more, as it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.**

Set forth in detail elsewhere in this Disclosure Statement is a description of the technical aspects of the classification of Claims and Interests, the relative allocations of property to holders of such Claims and Interests, the methodology as to how such property is to be distributed, the risks inherent in the Plan, and the applicable bankruptcy and tax consequences of the liquidation, as applicable, of the Debtors. The Plan is the product of lengthy discussions between and among the Debtors, the Committee, and other parties-in-interest and is based upon the Debtors' analysis of all Claims asserted or known as of the date hereof and an evaluation of the relative merits of potential conflicting Claims. The Debtors believe that the following overview of what Creditors

and Interest holders will receive under the Plan will be helpful in your consideration of whether you wish to accept or reject the Plan. This summary does not purport to be complete and should only be relied upon for voting purposes when read in conjunction with the Plan and this Disclosure Statement in their entirety. In the event of any inconsistency between the Plan and the Plan Documents, on the one hand, and this Disclosure Statement, on the other hand, the Plan and the Plan Documents shall control and take precedence with respect to such inconsistency.

Some Creditors may hold Impaired Claims in more than one Class and must vote separately for each Class. If you hold Claims in more than one Class, or multiple Claims in the same Class, you must cast a separate vote based on each individual Claim.

Please do not return any other documentation with your Ballot. For further information on casting a Ballot to vote on the Plan, please see a subsequent section of this Disclosure Statement.

### G.      Votes Required for Acceptance; Confirmation.

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of the claims of that class that actually cast ballots. The vote of a Creditor may be disregarded if the Bankruptcy Court determines, after notice and hearing, that the acceptance or rejection was not solicited or procured in good faith.

In addition to this voting requirement, Section 1129 of the Bankruptcy Code requires that a plan be accepted by each holder of a claim in an impaired class or that Bankruptcy Court finds the Plan provides the holder with at least as much value on account of its claim as it would receive in a liquidation under Chapter 7 of the Bankruptcy Code.

Confirmation will make the Plan binding upon the Debtors, holders of Claims against and Interests in the Debtors, and all other parties-in-interest regardless of whether they have accepted the Plan, and such holders of Claims and Interests will be prohibited from receiving payment from, or seeking recourse against, any assets that are distributed to other holders of Claims or Interests under the confirmed Plan. In addition, Confirmation will serve to enjoin holders of Claims or Interests from taking a wide variety of actions on account of any debt, Claim, liability, Interest, or right that arose prior to the Confirmation Date.

Confirmation of the Plan will enjoin holders of Claims and Interests from seeking to enforce Claims against and Interests in the Debtors, whether or not a proof of Claim based on such debt is Filed or deemed Filed, whether or not such Claim is Allowed, and whether or not the holder of such Claim has accepted the Plan.

The implementation of the Plan involves certain risks. For a discussion of these risks, see certain "RISK FACTORS" discussed in this Disclosure Statement.

### H.    Sources of Information.

Except as otherwise expressly indicated, the portions of this Disclosure Statement describing the Debtors, their business, properties, and management and the Plan have been prepared from information furnished by the Debtors.

The statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified, and neither the delivery of this Disclosure Statement nor any exchange of rights made in connection with it shall, under any circumstances, create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement.

No statements concerning the Debtors, the value of their property, or the value of any benefit offered to any Creditor or Interest holder in connection with the Plan should be relied on other than as set forth in this Disclosure Statement.  In arriving at a decision, parties should not rely on any representation or inducement made to secure their acceptance or rejection that is contrary to information contained in this Disclosure Statement.  Any such additional representations or inducements should be reported immediately to (1) counsel for Opus West and OWCC at Greenberg Traurig, 2200 Ross Avenue, Suite 5200, Dallas, Texas 75201, Attention: Bruce H. White, and (2) counsel for OWLP, Franklin Skierski Lovall Hayward, LLP, 10501 N. Central Expressway, Suite 106, Dallas, Texas 75231, Attention:  Peter Franklin.

## II.    BACKGROUND.

### A.    Overview of the Debtors.

Opus West is a Minnesota corporation incorporated on December 27, 1995.  Opus West is a real estate development firm headquartered in Phoenix, Arizona, and maintained additional offices in Austin, Houston, and Addison, Texas, as well as San Diego, Los Angeles, Irvine, Sacramento and Pleasanton, California.

OWLP, is a Delaware limited partnership that was formed on or about March 28, 2002. OWLP is owned by Opus West, as general partner (1% ownership), and Opus West Partners, Inc., as the sole limited partner (99% ownership).  OWLP was formed for the purpose of real estate development in the State of Texas and maintained its principal place of business in Addison, Texas.  OWLP, which does not currently have any employees, owned substantial assets in the State of Texas, including many in the Dallas area.

OWCC, a Minnesota corporation that was formed on or about April 1, 1959, is a wholly-owned subsidiary of Opus West.  OWCC was formed for the purpose of constructing real estate projects developed by Opus West and its affiliates.

Since 1979, Opus West and its affiliates have developed more than 52.7 million square feet of real estate space utilizing their in-house expertise in office, industrial, retail, multi-family, government, and institutional projects.  The Debtors' assets at certain times in the past included interests in approximately 50 commercial and residential real estate projects located across California, Arizona, and Texas.  These projects include condominium, office, industrial,

apartment, and retail projects in various stages of development. The Debtors collectively have approximately 15 employees as of the date hereof. Opus West is the direct or indirect parent of each of the affiliated Debtors. Opus West and its debtor and non-debtor affiliates constitute an integrated business enterprise.

As of May 31, 2009, Opus West and its debtor and non-debtor affiliates reported approximately $1,275,334,000 in total assets and approximately $1,462,328,000 in total liabilities. Opus West and its debtor and non-debtor affiliates had combined revenues in fiscal year 2008 of approximately $405,136,000.

The Schedules give a more detailed description of each Debtors' assets as of the Petition Date.

### B.    Debtors' Pre-Petition Efforts to Restructure.

Several factors have contributed to the commencement of these Chapter 11 cases, including the significant downturn in the real estate market and the global economy as a whole, as well as the lack of additional funding sources available to the Debtors. Specifically, residential and commercial land development is sensitive to changes in various economic factors, such as unemployment, consumer confidence, financing, and interest rates. The financial industry began to experience difficulty in 2007, creating instability and limiting funding sources, as well as causing many lenders to increase their credit requirements. As a result, fewer loan products and stricter lending qualifications have made it more and more difficult for borrowers to obtain financing to fund real estate projects or to refinance existing projects. In addition to the difficulties in obtaining project finance, the number of buyers in the market has also been reduced, leaving an excess in supply of available properties for sale. This, in turn, has lead to downward pricing trends.

As a result of the dramatic downturn in the national real estate market, the Debtors became out of compliance with many of the terms of their various loans. Prior to the Petition Date, the Debtors attempted to restructure their underlying loans and/or to facilitate a turnover of the associated collateral through a deed-in-lieu process. Unfortunately, these efforts did not result in a resolution of all issues with regard to the Debtors' pre-petition secured loans.

As set forth above, the Debtors attempted to effectuate a pre-petition restructuring or other disposition of their assets, but this has proven very difficult. The Debtors have attempted to raise capital, sell, or refinance, which has also been difficult. Cost-savings have been implemented and internal controls and procedures have been improved.

### C.    Pre-Petition Retention of Professionals.

To address exigent financial and operational issues, (1) Opus West and OWCC retained Greenberg Traurig, LLP ("**Greenberg Traurig**") as their restructuring counsel, and (2) OWLP retained Franklin Skierski Lovall Hayward, LLP ("**Franklin Skierski**") as its restructuring counsel. The Debtors also retained Chatham Financial Corporation ("**Chatham**") as their financial advisors and real estate consultants. Following its retention, Chatham began actively

marketing and soliciting offers for the Debtors' assets to potentially interested parties. Chatham contacted numerous potential buyers through e-mail correspondence and/or telephone calls.

## III.    THE CHAPTER 11 CASE.

### A.    Continuation of Business; Stay of Litigation.

On July 6, 2009 (the "Petition Date"), the Debtors commenced their respective bankruptcy cases by filing voluntary Chapter 11 petitions with the Bankruptcy Court.

Since the Petition Date, the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtors are authorized to operate in the ordinary course of business; but transactions out of the ordinary course of business must receive prior Bankruptcy Court approval. In addition, the Bankruptcy Court has supervised and approved the Debtors' employment of certain Professionals, including attorneys and financial advisors.

### B.    Significant Events During the Case.

The following is a brief description of some of the major events during the Case.

#### 1.    First Day Orders; Debtors' Professionals.

On July 6, 2009, the Debtors submitted certain so-called "first-day orders" to the Bankruptcy Court along with supporting motions, including orders authorizing (i) the use of cash collateral (Docket No. 3), and (ii) the sale of substantially all of the assets of the Debtors (Docket Nos. 9, 10, and 11). The Court issued final orders authorizing the use of cash collateral on July 27, 2009 (Docket No. 183), and approving certain bidding procedures related to the sale of substantially all of the Debtors' assets on July 27, 2009 (Docket Nos. 185, 186, and 189), each as more fully described below.

In addition to the Debtors' request for certain first-day orders, (i) Opus West and OWCC requested approval of, and the Court approved, the retention of Greenberg Traurig as their bankruptcy counsel throughout these bankruptcy cases (Application, at Docket No. 12; Order, at Docket No. 172), and (ii) OWLP requested approval of, and the Court approved, the retention of Franklin Skierski as its bankruptcy counsel throughout these bankruptcy cases (Application, at Docket No. 13; Order, at Docket No. 177). In addition to engaging counsel at the outset of the case, the Debtors obtained entry of an order authorizing it to employ Chatham to serve as financial advisor and real estate consultant to the Debtors (Application, at Docket No. 15; Order, at Docket No. 176).

#### 2.    The Committee; Committee's Professionals.

On July 15, 2009, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "**Committee**") comprising the following entities: (i) Ennis Steel Industries, Inc.; (ii) King of Texas Roofing Company, L.P.; and (iii) R. L. Murphey Commercial Roof Systems, L.P. (Docket No. 89). Gardere Wynne Sewell LLP was retained as counsel to the

Committee pursuant to an order entered by the Bankruptcy Court on July 24, 2009 (Docket No. 168).

### 3.    Section 341 Meeting.

The Office of the United States Trustee convened the official meeting of creditors in the Case pursuant to Section 341 in Dallas, Texas, on August 12, 2009.

### 4.    Section 363 Sale of Assets and Other Sales.

On the Petition Date, the Debtors filed various motions requesting authority to sell certain real property and equity interests of the Debtors (Docket Nos. 9, 10, and 11). The Bankruptcy Court thereafter entered orders approving certain bidding procedures related to the sales proposed by the Debtors (Docket Nos. 185, 186, and 189) (the "**Bid Procedures Orders**").

Pursuant to the Bid Procedures Orders, the Court approved specific procedures for interested parties to submit bids and participate in a competitive auctions of certain of the Debtors' real property and equity interests. The Bid Procedures Orders set a deadline of August 21, 2009, for the submission of bids, and auctions were scheduled for August 26, and 27, 2009.

On August 26 and 27, 2009, the Debtors held auctions (the "**Auctions**") for the sale of certain real property and certain equity interests. During the course of the Auctions, competitive bids were exchanged bids for the Debtors assets. At the Auctions, the Debtors and their advisors examined the bids submitted and considered the value of each bid taking into account both cash and the assumption of liabilities in determining the realizable value to the Debtors' Estates. Ultimately, the Debtors selected, in conjunction with their advisors, the winning bidders for their assets at the Auctions.

On August 31, 2009, the Court approved the sales of assets to the winning bidders as part of the Auctions pursuant to those certain orders entered as Docket Nos. 369, 370, 371, 373, 374, and 381 (collectively, the "**Sale Orders**"). Subsequent to the Auctions and pursuant to the Sale Orders, the Debtors and the applicable winning purchasers executed various asset purchase agreements and closed such sales. The following chart summarizes the sales consummated and other disposition of assets by the Debtors after the Petition Date:

| SPE Interest Sales | Disposition Price | Cash to Estate |
|---|---|---|
| Alexan Galleria | $2,500.00 | $2,500.00 |
| Broadstone Cypress | $2,500.00 | $2,500.00 |
| Broadstone Parkway | Not Sold | $0.00 |
| Broadstone Walker Commons | $5,000.00 | $5,000.00 |
| Broadstone Woodbridge | $5,000.00 | $5,000.00 |
| Wynhaven Crossings | $50,000.00 | $50,000.00 |
| Commons at Chino Hills | $1,600.00 | $1,600.00 |
| Fort Bend Crossing | Not Sold | $0.00 |

| | | |
|---|---|---|
| Mill Crossing | $100.00 | $100.00 |
| Shoppes at Chino Hills | $5,000.00 | $5,000.00 |
| Glendale Corporate Center | Not Sold | $0.00 |
| Northgate Corporate Center | Not Sold | $0.00 |
| Opus Center Irvine III | $1,000.00 | $1,000.00 |
| Opus Point Phase I Office | $500.00 | $500.00 |
| Pima Center I & II, IIIA, IIIB, IIIC, IE | $1,000.00 | $1,000.00 |
| Rocklin Corporate Plaza | Not Sold | $0.00 |
| Sacramento Gateway II | Not Sold | $0.00 |
| Tempe Gateway | $112,000.00 | $112,000.00 |
| Two Addison Circle | Not Sold | $0.00 |
| Camarillo Ranch | Not Sold | $0.00 |
| Fremont Tech Center | Not Sold | $0.00 |
| Opus Point Phase I | $500.00 | $500.00 |
| Opus Logistics Center | $1,000.00 | $1,000.00 |
| Opus Point Phase II | $500.00 | $500.00 |
| Gateway Corporate Center Land | $1,000.00 | $1,000.00 |
| Haven Point Land | Not Sold | $0.00 |
| Opus Point Phase II Land | $500.00 | $500.00 |
| Phoenix Downtown Land | $1,700,000.00 | $1,700,000.00 |
| South Mountain Land | Not Sold | $0.00 |
| Stanford Ranch Land | Not Sold | $0.00 |
| Westlake North Land | $1,000.00 | $1,000.00 |
| 77th Avenue | $25,250.00 | $25,250.00 |
| CSD Reimbursement | n/a | $1,353,881.00[7] |
| Premier CR, L.L.C. | $1,000.00 | $1,000.00 |
| Premier VI, L.L.C. | Not Sold | $0.00 |
| Premier VII, L.L.C. | $58,000.00 | $58,000.00 |
| Premier VIII, L.L.C. | $150,000.00 | $150,000.00 |
| Stockton Receivable | Not Sold | $0.00 |
| **Total SPE Interest Sales:** | $2,124,950.00 | $3,478,831.00 |
| | | |
| **Real Estate Sales** | **Disposition Price** | **Cash to Estate** |
| 121 Lakepointe Crossing | $29,900,000.00 | $6,100,000.00[8] |
| Colonial Lakes Land | Not Sold | $0.00 |

---

[7] Funds collected pursuant to the contractual terms related thereto.

[8] Funds reserved for Distribution to holders of mechanics and materialmen Liens.

| | | |
|---|---|---|
| Eastchase Pad | $60,000.00 | $60,000.00 |
| Highland Village Land | $3,068,500.00 | $0.00 |
| Hill Country Galleria Townhome Land | $110,000.00 | $110,000.00 |
| Main Street Commons Land | Not Sold | $0.00 |
| **Total Real Estate Asset Sales:** | $33,138,500.00 | $6,270,000.00 |
| | | |
| **TOTAL SALES:** | $35,263,450.00 | $9,748,831.00 |

In addition to the foregoing sales, the Debtors have received authority from the Court and have completed or are completing the sale of various miscellaneous assets, including, but not limited to, trucks, furniture, and computer equipment. Further, a wholly owned subsidiary of Opus West has recently sold a senior living facility, with the Opus West estate receiving the net proceeds thereof.

**5.      Claims Process and Bar Dates.**

The Bankruptcy Court established (i) November 9, 2009, as the deadline (or "**Bar Date**") for Filing proofs of Claim. The Debtors have requested pursuant to separate motion that the Bankruptcy Court set December 21, 2009, as the deadline for Government Units to file proofs of Claim.

The Surviving Officer will review all Claims Filed and will develop and analyze a database of all Claims asserted against the Debtors. The Surviving Officer will analyze proofs of Claim to determine whether to object to the allowance of such Claims.

The Claims asserted against any of the Debtors may be materially in excess of the total amount of Allowed Claims estimated by the Debtors in connection with the development of the Plan because, among other things, certain Claims (i) are filed in duplicate, (ii) consist of amendments to previously filed Claims, (iii) assert Claims in excess of the amount actually owed, (iv) do not allege an obligation of the Debtors, (v) assert contingent Claims against the Debtors, (vi) were Filed after the Bar Date, or (vii) include post-petition interest and other disallowable amounts. The Debtors and/or the Surviving Officer intend to File objections to, among others, those Claims falling into the foregoing categories.

The Debtors project that the Claims asserted against it will be resolved in and reduced to an amount that approximates the Debtors' estimates of Allowed Claims contained in this Disclosure Statement. However, the actual aggregate amount of Allowed Claims in any Class may differ significantly from the Debtors' estimates thereof and any variance from such estimates may affect Distributions as discussed further herein.

**IV.    RISK FACTORS**

**Holders of Claims should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents**

delivered together herewith and/or incorporated by reference herein), prior to voting to accept or reject the Plan.

### A.    Risks Related to Projections and Estimates.

This Disclosure Statement and the materials incorporated by reference herein (the "**Incorporated Materials**") include "forward-looking statements" as defined in Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. All statements other than statements of historical facts included in this Disclosure Statement and the Incorporated Materials regarding the Debtors' financial position, business strategies, plans, and objectives of management for future operations and indebtedness covenant compliance, including, but not limited to, words such as "anticipates," "expects," "estimates," "believes," and "likely," are forward-looking statements. The Debtors believe that their current views and expectations are based on reasonable assumptions; however, there are significant risks and uncertainties that could significantly affect expected results. Important factors that could cause actual results to differ materially from those in the forward-looking statements ("**Cautionary Statements**") are disclosed throughout this Disclosure Statement. All subsequent written and oral forward-looking statements attributable to the Debtors, or persons acting on their behalf, are expressly qualified in their entirety by the Cautionary Statements. The Debtors do not intend to update or otherwise revise the forward-looking statements contained herein to reflect events or circumstances after the date hereof or to reflect the occurrence of unanticipated events.

### B.    Objection to Classifications.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court or other parties-in-interest will reach the same conclusion.

### C.    Risk of Nonconfirmation of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, and that the value of Distributions to dissenting Creditors and Interest holders not be less than the value of Distributions such Creditors and Interest holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan satisfies all the requirements for Confirmation under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for Confirmation of the Plan have been satisfied.

### D.    Nonoccurrence of Effective Date of the Plan.

Even if all Classes of Claims that are entitled to vote accept the Plan, the Effective Date for the Plan may not occur.  The Plan sets forth conditions to the occurrence of the Effective Date of the Plan which may not be satisfied by the Effective Date.  The Debtors believe that they will satisfy all requirements for consummation required under the Plan.  There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for consummation of the Plan have been satisfied.

## V.    CONFIRMATION OF THE PLAN

### A.    Voting Procedures and Requirements.

The Debtors are providing copies of this Disclosure Statement and Ballots to all known holders of Impaired Claims who are entitled to vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims that are "Impaired" under the terms and provisions of the Plan and entitled to receive a Distribution thereunder are entitled to vote to accept or reject the Plan.  Accordingly, Classes of Claims that are not Impaired under the terms and provision of the Plan are *not* entitled to vote on the Plan.  In addition, Classes of Claims or Interests that are not entitled to a Distribution under the terms and provisions of the Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

**If you hold an Impaired Claim against the Debtors, you are entitled to vote on the Plan.  If you hold more than one Impaired Claim, you are entitled to cast a vote on account of each such Claim.  Some Creditors may therefore be entitled to cast more than one Ballot.**

Some holders of Claims may hold Claims in more than one Impaired Class and must vote separately for each Class.  Such holders should make duplicate copies of the form of Ballot and complete and sign a Ballot for each Impaired Claim.  The following voting procedures (the **"Voting Procedures"**) have been established with respect to the amount and classification of Claims and Interests, and the determination of the validity of Ballots submitted, for voting purposes:

1.    Unless otherwise provided in the Tabulation Rules (described below), a Claim will be deemed temporarily allowed for voting purposes in an amount equal to (i) if a proof of Claim has not been timely Filed, the amount of such Claim as set forth in the Schedules, or (ii) the amount of such Claim as set forth in a timely Filed proof of Claim.

2.    If a Claim is deemed Allowed in accordance with the Plan, such Claim will be temporarily allowed for voting purposes in the deemed Allowed amount set forth in the Plan.

3.    If a Claim for which a proof of Claim has been timely Filed is marked in whole or in part as contingent, unliquidated, or disputed on its face, such portion of the Claim that is marked as contingent, unliquidated, or disputed will be temporarily allowed for voting purposes in the amount of $1.00.

4.    If a Claim has been estimated or otherwise allowed for voting purposes by order of the Court, such Claim will be temporarily allowed for voting purposes in the amount so estimated or allowed by the Court.

5.    If a Creditor casts more than one Ballot voting the same Claim before the Voting Deadline, the last dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus will supersede any prior Ballots.

6.    Creditors will be required to vote all of their Claims within a particular Class under the Plan either to accept or reject the Plan and may not split their vote. A Ballot (or a group of Ballots within a Plan Class received from a single Creditor) that partially rejects and partially accepts the Plan will not be counted.

In addition, the following tabulation procedures (the "**Tabulation Rules**") have been established for the tabulation of Ballots:

1.    If a Claim Holder identifies a claim amount on its Ballot that is less than the amount otherwise calculated in accordance with these Tabulation Rules, the Claim will be temporarily allowed for voting purposes in the lesser amount identified on such Ballot.

2.    Ballots that are otherwise validly executed but do not indicate either acceptance or rejection of the Plan will not be counted.

3.    The Debtors will not accept Ballots by e-mail or facsimile transmission.

4.    Only Ballots that are timely received with signatures will be counted. Unsigned Ballots will not be counted.

5.    Ballots postmarked prior to the Voting Deadline, but received after the Voting Deadline, will not be counted.

6.    Ballots that are illegible, or contain insufficient information to permit the identification of the Creditor, will not be counted.

7.    If a Creditor simultaneously casts inconsistent duplicate Ballots, with respect to the same claim, such Ballots will not be counted.

8.    Unless otherwise ordered by the Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots shall be determined by the Debtors, which determination shall be final and binding.

**IN ORDER TO BE COUNTED, EXCEPT TO THE EXTENT THE DEBTORS SO DETERMINE OR AS PERMITTED BY THE BANKRUPTCY COURT PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 3018, BALLOTS MUST BE SIGNED AND RETURNED SO THAT THEY ARE ACTUALLY RECEIVED NO LATER THAN 4:30 P.M. (PREVAILING TEXAS TIME) ON DECEMBER __, 2009, AT THE FOLLOWING ADDRESS:**

Greenberg Traurig, LLP
Attention: Mugdha Kelkar
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201

**BALLOTS WILL NOT BE ACCEPTED BY FACSIMILE OR EMAIL**

As mentioned above, if your Ballot is not signed and returned as described, it will not be counted. If your Ballot is damaged or lost, or if you do not receive a Ballot, you may request a replacement by addressing a written request to counsel for the Debtors at the foregoing address or by calling (214) 665-3600. Please follow the directions contained on the Ballot carefully.

The process of soliciting acceptance of the Plan must be fair and open without outside influence in the form of representations, inducements, or duress of any kind. To the extent that you believe solicitation of your vote from any party is being sought outside of the judicially-approved and statutorily-defined disclosure requirements and Voting Procedures, please contact Debtors' counsel.

### B.    Acceptance.

Acceptance of the Plan requires that each Impaired Class of Claims or Interests (as classified therein) accepts the Plan, with certain exceptions discussed below. Thus, acceptance of the Plan requires acceptance by each of the Impaired Classes.

Classes of Claims and Interests that are not Impaired under the Plan are deemed to have accepted the Plan. Acceptances of the Plan are being solicited only from those persons who hold Claims or Interests in an Impaired Class.

The Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by the holders of at least two-thirds (2/3) in dollar amount and a majority in number of Claims of that Class, but for that purpose, only those Claims, the holders of which actually vote to accept or reject the Plan, are counted.

### C.    Confirmation of the Plan.

In order to confirm the Plan, Section 1129 requires the Bankruptcy Court to make a series of determinations concerning the Plan, including, without limitation: (1) that the Plan has classified Claims and Interests in a permissible manner; (2) that the contents of the Plan complies with the technical requirements of the Bankruptcy Code; (3) that the Debtors have proposed the Plan in good faith; and (4) that the Debtors have made disclosures concerning the Plan which are adequate and include information concerning all payments made or promised in connection with the Plan or otherwise. The Debtors believe that all of these conditions have been or will be met with respect to the Plan.

The Bankruptcy Code requires that, unless the "cramdown" provisions of the Bankruptcy Code (as discussed below) are utilized, as a condition precedent to confirmation, the Plan be accepted by the requisite votes of each Class of Claims and Interests voting as separate Classes.

Therefore, the Bankruptcy Court must find, in order to confirm the Plan, that the Plan has been duly accepted. In addition, the Bankruptcy Court must find that the Plan is feasible and that the Plan is in the "best interests" of all holders of Claims and Interests. Thus, even if holders of Claims were to accept the Plan by the requisite number of votes, the Bankruptcy Court is still required to make independent findings respecting the Plan's feasibility and whether the Plan is in the best interests of holders of Claims and Interests.

### 1.    The Best Interests Test.

Whether or not the Plan is accepted by each Impaired Class of Claims entitled to vote on the Plan, in order to confirm the Plan, the Bankruptcy Court must independently determine, pursuant to Section 1129(a)(7), that the Plan is in the best interests of each holder of an Impaired Claim or Interest that has not voted to accept the Plan. This requirement is satisfied if the Plan provides each non-accepting holder of a Claim or Interest in such Impaired Class a recovery on account of such holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the Distribution each such holder would receive in a liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

To determine the value that holders of Impaired Claims and Interests would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated if the Debtors' Cases were converted to Chapter 7 and a Chapter 7 trustee liquidated the Debtors' assets (the "**Liquidation Value**"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by cash held by the Debtors and reduced by certain increased costs and claims that arise in Chapter 7 that do not arise in Chapter 11. Attached hereto as <u>Appendix "2"</u> are liquidation budgets (the "**Liquidation Budgets**") showing amounts available to be distributed to holders of Allowed Claims. The Debtors believe that the Plan provides recoveries to holders of Allowed Claims and Interests not less than - and likely greater than - the recoveries to holders of Claims and Interests in a Chapter 7 liquidation. The Debtors also believe that professional fees incurred in liquidating pursuant to the Plan will be less than in a Chapter 7 and that liquidation will be quicker under the Plan than under Chapter 7. The Plan includes a cap on costs associated with liquidating through the Plan, which cap is not available under Chapter 7. As a result, the Debtors believe Section 1129(a)(7) is satisfied.

### 2.    Feasibility.

Even if the Plan is accepted by each Class of Claims and Interests voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the "best interests" test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, the Debtors must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed the Debtors' ability to meet its obligations under the Plan and determined that the Debtors and the Surviving Officer will be able to make all payments contemplated by the Plan.

### D.    Non-Acceptance and Cramdown.

Pursuant to Section 1129(b), the Bankruptcy Court may confirm the Plan despite the non-acceptance of the Plan by an Impaired Class. This procedure is commonly referred to as a "cramdown." Section 1129(b) provides that upon request of the proponent of the Plan, the Bankruptcy Court shall confirm the Plan despite the lack of acceptance by an Impaired Class or Classes if the Bankruptcy Court finds that (1) the Plan does not discriminate unfairly with respect to each non-accepting Impaired Class, (2) the Plan is "fair and equitable" with respect to each non-accepting Impaired Class, (3) at least one Impaired Class has accepted the Plan (without counting acceptances by insiders), and (4) the Plan satisfies the requirements set forth in Section 1129(a) other than Section 1129(a)(8). In general, Section 1129(b) permits Confirmation notwithstanding non-acceptance by an Impaired Class if that Class and all junior Classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting Class be paid in full before a junior Class may receive anything under the Plan.

### 1.    The Plan Is Fair and Equitable.

The Bankruptcy Code establishes different "fair and equitable" tests for holders of Secured Claims, Unsecured Claims, and Interests. As to the dissenting Class, the test sets different standards, depending on the type of Claims or Interests in such Class.

#### (a)    Secured Claims.

With respect to a Class of Secured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) the holders of such Secured Claims will retain the liens securing such Claims and will receive on account of such Claim deferred Cash payments totaling at least the Allowed amount of such Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in such property, or (ii) the holders of such Claims will realize the indubitable equivalent of such Claims under the Plan.

#### (b)    General Unsecured Claims.

With respect to a Class of General Unsecured Claims that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that either (i) each holder of a General Unsecured Claim of the dissenting Class receives or retains under the Plan property of a value equal to the Allowed amount of its General Unsecured Claim, or (ii) the holders of Claims or Interests that are junior to the Claims of the holders of such General Unsecured Claims will not receive or retain any property under the Plan.

#### (c)    Interests.

With respect to a Class of Interests that does not accept the Plan, the Debtors must demonstrate to the Bankruptcy Court that (i) each holder of an Interest of the dissenting Class receives or retains, on account of such Interest, property of a value equal to the greatest of the Allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such Interest, or (ii) the holders

of any Interest that is junior to the Interests of such Class will not receive or retain any property under the Plan.

The Debtors believe that the Plan is fair and equitable with respect to each Class treated therein.

### 2.    No Unfair Discrimination.

A Plan "does not discriminate unfairly" with respect to a nonaccepting Class if the value of the Cash and securities to be distributed to the nonaccepting Class is equal or otherwise fair when compared to the value of Distributions to other Classes whose legal rights are the same as those of the nonaccepting Class. Since all similarly situated holders of Claims or Interests are classified together and all Claims or Interests in a given Class are treated identically, the Debtors believe the Plan does not unfairly discriminate against any Class.

### E.    Confirmation Hearing.

Section 1128(a) requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "**Confirmation Hearing**"). Section 1128(b) provides that any party-in-interest may object to Confirmation of a Plan. Notice of the Confirmation Hearing will be provided to all holders of Claims and Interests and other parties-in-interest (the "**Confirmation Notice**"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to Confirmation of the Plan must be made in writing, specifying in detail the name and address of the person or Entity objecting, the grounds for the objection, and the nature and amount of the Claim or Interest held by the objector. Objections must be Filed with the Bankruptcy Court, together with proof of service, and served upon the parties so designated in the Confirmation Notice, on or before the time and date designated in the Confirmation Notice as being the last date for serving and filing objections to Confirmation of the Plan. Objections to Confirmation of the Plan are governed by Federal Rule of Bankruptcy Procedure 9014 and the Local Rules of the Bankruptcy Court.

## VI.    ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not confirmed by the Bankruptcy Court and consummated, the alternatives to the Plan include (a) the liquidation of the Debtors under Chapter 7 of the Bankruptcy Code, or (b) an alternative Plan under Chapter 11 of the Bankruptcy Code.

### A.    Liquidation Under Chapter 7.

If the Plan cannot be confirmed, the Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In that event, a trustee would be appointed to liquidate the assets of the Debtors for Distribution to holders of Claims and Interests in accordance with the priorities established by the Bankruptcy Code. As more fully demonstrated in the Liquidation Budgets included in Appendix "2," the Debtors believe that Confirmation of the Plan will provide each holder of a Claim entitled to receive a Distribution under the Plan with a recovery that is not less than it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

**Accordingly, the Debtors recommend that all Creditors vote to accept the Plan.**

### B.     Alternative Plan.

If the Plan is not confirmed as to one or more Debtors, one or more Debtors (or if the Debtors' exclusive period in which to File a plan or plan of reorganization has expired, any other party-in-interest) may be entitled to File a different plan. However, in light of the fact that the Debtors have already liquidated their primary assets, the Debtors believe that no feasible plan structure could be proposed other than that contained in the Plan. The Debtors therefore believe that the Plan provides holders of Claims and Interests with the greatest value possible under the circumstances. Furthermore, the Debtors believe that any subsequently proposed plan would likely provide a less favorable treatment than the Plan by further delaying the payment of Distributions.

Since the Debtors have separate voting Classes, it is possible that the Court might confirm the Plan as to one or more Debtors and decline to confirm the Plan as to one or more Debtors. Should that occur, the Debtors reserve the right to file a new Plan, convert one or more of the Debtors' Cases to a case under Chapter 7, and/or take such other actions as they deem appropriate.

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The Plan provides for a liquidation of the Debtors' assets and the Distribution of the proceeds of that liquidation to the Debtors' creditors pursuant to the terms of the Plan. All Interests in the Debtors will be withdrawn. Holders of Claims and Interests should consult their own tax advisors regarding the tax consequences of the treatment of the Claims and Interests under the Plan.

## VIII.   SECURITIES LAWS CONSEQUENCES OF PLAN

The Plan provides for a liquidation of the Debtors' assets. The Debtors will no longer remain a going concern. Accordingly, no new securities will be issued under the Plan. All existing securities will be cancelled on the Effective Date of the Plan. Holders of Interests should consult their own advisors regarding any security law consequences of the treatment of their Interests under the Plan.

## IX.    CONCLUSION AND RECOMMENDATION

The Debtors believes that Confirmation of the Plan is desirable and in the best interests of all holders of Claims and Interests. The Debtors therefore urge you to vote to accept the Plan.

Dated: November 25, 2009        Respectfully submitted,

OPUS WEST CORPORATION, OPUS WEST
CONSTRUCTION CORPORATION, AND OPUS
WEST LP, Debtors and Debtors-in-Possession

John Greer, Authorized Representative

Prepared by:

Clifton R. Jessup, Jr.
State Bar No. 10655020
Bruce H. White
State Bar No. 21288850
Bryan L. Elwood
State Bar No. 24029535
GREENBERG TRAURIG, LLP
2200 Ross Ave., Suite 5200
Dallas, Texas 75201
Telephone: 214-665-3600
Facsimile: 214-665-5938

*Counsel for Opus West Corporation and
Opus West Construction Corporation*

and

Peter Franklin
State Bar No. 07378000
Doug Skierski
State Bar No. 24008046
Erin K. Lovall
State Bar No. 24032553
FRANKLIN SKIERSKI LOVALL HAYWARD, LLP
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231
Telephone: 972-755-7100
Facsimile: 972-755-7110

*Counsel for Opus West LP*